## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

ROBERTO VALDEZ,               §
TDCJ # 1679443,               §
    Petitioner,       §
                      §
v.                            §
                      §     EP-14-CV-338-PRM
WILLIAM STEPHENS,             §
Director, Texas Department of §
Criminal Justice, Correctional §
Institutions Division,        §
    Respondent.       §

## MEMORANDUM OPINION AND ORDER

On this day, the Court considered Petitioner Roberto Valdez's "Petition for a Writ of Habeas Corpus by a Person in State Custody" pursuant to 28 U.S.C. § 2254 (ECF No. 3) [hereinafter "Petition"], filed on September 30, 2014, Respondent William Stephens's "Answer with Brief in Support" (ECF No. 8) [hereinafter "Answer"], filed on November 19, 2014, and Petitioner's "Traverse to Answer" (ECF No. 16), filed on January 6, 2015, in the above-captioned cause.

Petitioner challenges Respondent William Stephens's custody over him, based on his convictions in the 171st Judicial District Court of El

Paso County, Texas, for capital murder and aggravated assault.[1] Specifically, Petitioner alleges trial court error, prosecutorial misconduct, and ineffective assistance of counsel.[2]   He also argues that the evidence at trial was legally insufficient to support his conviction.[3] Respondent counters that "[t]he [P]etition should be dismissed with prejudice because Valdez fails to overcome [the Antiterrorism and Effective Death Penalty Act's] relitigation bar and his claims lack merit."[4]

After carefully reviewing the record, and for the reasons discussed below, the Court finds that Petitioner is not entitled to § 2254 relief. The Court will accordingly deny Petitioner's Petition and decline to certify his issues for appeal.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On June 14, 2008, twenty-year-old Ana Sarahi Hernandez

---

[1] *State v. Valdez*, Cause No. 20080D04281 (171st Dist. Ct. El Paso Cnty., Tex. Oct. 7, 2010), *aff'd, Valdez v. Texas*, 08-10-00331-CR, 2012 WL 4928905 (Tex. App.—El Paso, Oct. 17, 2012, pet. ref'd).

[2] Pet. 4–8.

[3] Pet. 8.

[4] Answer 1.

attended a social gathering at the home of her boyfriend, Jorge
Cardenas.[5]   Sometime during the evening, Hernandez argued with
Cardenas and left Cardenas's home in her vehicle.[6]

That same evening, Hernandez's fourteen-year-old sister, Crystal
Nesbitt, awaited her return from the social gathering, anticipating that
they would watch a movie together.[7]   At approximately midnight,
Crystal Nesbitt saw the headlights of her sister's car outside their
house.[8]   Crystal Nesbitt then heard a second vehicle, which she
recognized as Petitioner's[9] car.[10]   Sometime after hearing Petitioner's
vehicle, Crystal Nesbitt fell asleep.[11]

---

[5] *Valdez*, 2012 WL 4928905, at *1.

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] The nature of Petitioner's relationship with Hernandez is unclear from
the trial testimony.   Jessica Gausin and Luis Martinez, acquaintances of
both Hernandez and Petitioner, testified that they believed Hernandez and
Petitioner were dating.   Trial Tr. v. 4, 93–95, 105, Nov. 17, 2014, ECF No.
7-15.   Crystal Nesbitt testified, however, that Petitioner and Hernandez
were not dating but would spend significant amounts of time together.
Trial Tr. v. 3, 92, Nov. 17, 2014, ECF No. 7-13.

[10] *Valdez*, 2012 WL 4928905, at *1.

The testimony elicited at trial demonstrated that Petitioner had driven Hernandez to his house sometime between 12:30 and 3:00 a.m.[11] Cardenas called Hernandez several times after she left his home; he understood from his last conversation with Hernandez that Petitioner would drive her back to Cardenas's house, but she never returned.[13]

At approximately 6:00 a.m., Hernandez's mother, Maria Nesbitt, discovered that Hernandez was missing.[14]   Maria and Crystal Nesbitt called Hernandez's acquaintances, including Cardenas, to determine whether they had any knowledge of Hernandez's whereabouts, but none of the individuals they called knew where she was.[15]

Maria and Crystal Nesbitt then went to Petitioner's house[16] to search for Hernandez.[17]   They rang the doorbell and knocked on the

---

[11] *Id.* at 1.

[12] Trial Tr. vol. 4, 93, 108, Nov. 17, 2014, ECF No. 7-15.

[13] Valdez, 2012 WL 4928905, at *1.

[14] *Id.*

[15] *Id.*

[16] It is unclear from the trial testimony the reason Maria and Crystal Nesbitt decided to search for Hernandez at Petitioner's residence.

[17] *Id.*

door and windows, but no one answered.[18]   Maria and Crystal Nesbitt then returned to their home to continue waiting for Hernandez.[19]   A few hours later, Maria and Crystal Nesbitt returned to Petitioner's home to search for Hernandez and, once again, rang the doorbell and knocked on the door, to the same result—no response.[20]   Because Crystal Nesbitt became increasingly worried about her sister, she scaled Petitioner's fence and entered his back yard.[21]   While peering through a window, she observed her sister arguing with Petitioner.[22]   At that point, Crystal Nesbitt returned to her mother and told her to call the police.[23]

From the front door, Crystal Nesbitt could now hear her sister screaming and crying inside Petitioner's home.[24]   She discovered a

---

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

partially-open window and climbed inside the house.[25]   Upon entering

the residence, Crystal Nesbitt heard her sister screaming her name from

upstairs.[26]   When she ran upstairs, Crystal Nesbitt saw Petitioner

clenching a knife in his right hand standing over her blood-covered

sister.[27]   As Crystal Nesbitt approached, Petitioner swung the knife at

her and cut her.[28]   Hernandez tried to stop Petitioner by pulling on the

back of his shirt and saying, "No Roberto, not to my sister."[29]

When the police arrived at Petitioner's residence, they also heard

someone screaming inside.[30]   They entered, ran upstairs, and saw

Hernandez on a bed, covered in blood.[31]   They also witnessed Petitioner

standing near Hernandez, clenching a knife in his hand.[32]   After the

_____

[25] *Id.*

[26] *Id.* at 2.

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] *Id.*

police handcuffed Petitioner and removed him from the room, Officer Ricardo Huante noticed that Hernandez was bleeding profusely from wounds to her chest.[33]   Officer Huante attempted to aid Hernandez by putting pressure on her wounds until Emergency Medical Services ("EMS") personnel arrived.[34]   Hernandez told Officer Huante several times that she was dying.[35]   In an effort to keep her conscious, Officer Huante asked Hernandez to recount what had transpired.[36]   Hernandez informed him that she had voluntarily accompanied Petitioner to his house, but when she expressed a desire to leave, he refused to let her depart.[37]   Hernandez added that when her mother and sister arrived at Petitioner's house, he became angry and started stabbing her.[38]

EMS personnel transported Hernandez to the hospital where she underwent surgery to insert chest tubes and to treat stab wounds to her

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

neck, abdomen, chest, back, right shoulder, right arm, and hand.[39]
After the surgery, Hernandez continued to bleed in her left chest cavity
and suffered cardiac arrest.[40]   Medical personnel resuscitated her and
returned her to surgery, where a surgeon determined that her left lung
and the posterior chest wall stab wounds were still bleeding.[41]   The
surgeon sutured the lung and stab wound and added two more chest
tubes to the left side of Hernandez's chest.[42]   The following day,
Hernandez lapsed into a coma as a result of insufficient blood pressure.[43]
A physician declared her dead the next day.[44]

The medical examiner's office performed an autopsy and
determined that Hernandez bled to death due to multiple stab wounds.[45]
A peer review at the hospital concluded that her death could have been

----

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

prevented if medical personnel had more quickly appreciated the significance of the blood loss through a chest tube.[46]

A grand jury indicted Petitioner for (1) capital murder by stabbing with a knife while in the course of committing or attempting to commit the offense of kidnapping and (2) aggravated assault with a deadly weapon.[47]   Petitioner pleaded not guilty and proceeded to trial.[48]

At trial, Officer Huante testified about Hernandez's statements to him at Petitioner's house.[49]   Dr. Juan Contin, the interim Chief Medical Examiner, testified that he did not perform the autopsy on Hernandez, but had reviewed the medical records and autopsy report.[50]   He offered his expert medical opinion that Hernandez bled to death as a result of multiple stab wounds.[51]   Dr. Contin also reviewed and explained the

---

[46] *Id.*

[47] *Id.* at 7.

[48] *Id.*

[49] Trial Tr. vol. 3, 224–230, Nov. 17, 2014, ECF No. 7-14.

[50] Trial Tr. vol. 4, 6, 10, Nov. 17, 2014, ECF No. 7-15.

[51] *Id.* at 38.

peer review report to the jury.[52]

Dr. Leann Grossberg, an expert in forensic pathology, testified for the defense.[53]  Dr. Grossberg questioned whether the bleeding in Hernandez's left chest cavity was caused by the stab wound to the side of her back or by the tube that medical personnel placed in her chest.[54]

Jessica Gausin and her boyfriend, Luis Martinez, also testified for the defense.[55]  They explained that they went to Petitioner's house on June 14, 2008, in the late evening.[56]  They recalled that Petitioner left his house after receiving a phone call and returned with Hernandez, who was crying.[57]  Gausin and Martinez left the residence at around 3 a.m. the following morning, while Hernandez remained at the house.[58] Neither of them claimed they saw Petitioner holding Hernandez against

---

[52] *Id.* at 39–41.

[53] *Id.* at 120–35.

[54] *Id.* at 130.

[55] *Id.* at 86–111.

[56] *Id.* at 90, 106.

[57] *Id.* at 92–93, 95, 108–09.

[58] *Id.* at 96, 110.

her will.[59]

Ultimately, the jury rejected Petitioner's defense and found him guilty of causing Hernandez's death by stabbing her with a knife while in the course of committing or attempting to commit the offense of kidnapping.[60]   The jury also found him guilty of aggravated assault by causing bodily injury to Crystal Nesbitt by cutting her with a knife.[61] The trial court assessed punishment at life in prison without the possibility of parole for capital murder, and fifteen years in prison for aggravated assault.[62]

The Eighth Court of Appeals of Texas affirmed Petitioner's convictions,[63] and the Texas Court of Criminal Appeals refused his petition for discretionary review.[64]   Petitioner filed a state application

---

[59] *Id.*

[60] Valdez, 2012 WL 4928905, at * 3.

[61] *Id.*

[62] *Id.* at 7.

[63] *Valdez v. State*, No. 08–10–00331–CR, 2012 WL 4928905 (Tex. App.—El Paso 2012, pet. ref'd).

[64] *Valdez v. State*, PD–1553–12 (Tex. Crim. App. February 13, 2013).

for writ of habeas corpus challenging his convictions, which the Texas Court of Criminal Appeals denied.[65]   The instant petition followed.

Mindful of Petitioner's *pro se* status,[66] the Court understands him to assert the following grounds for relief:

> 1.    The trial court denied Petitioner his Sixth Amendment right to confront the witnesses against him by allowing the arresting officer, Officer Ricardo Huante, to testify that the victim told him that the Petitioner had stabbed her.
>
> 2.    The State, through the El Paso County District Attorney's Office, denied Petitioner his due process rights, in violation of the Fifth and Fourteenth Amendments, when it failed to disclose that its expert witness, Dr. Juan Contin, had been discharged from his position as Chief Medical Examiner in 2000 because of incompetence.
>
> 3.    The trial court denied Petitioner a fair and impartial trial, in violation of the Fifth and Fourteenth Amendments, when it failed to address concurrent causation in the jury charge.

---

[65] State Writ R. (Clerk's R.), WR-81,692-01, p. 42, Action Taken, Nov. 17, 2014, ECF Nos. 7-4, 7-1

[66] *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding *pro se* pleadings to less stringent standards than formal pleadings drafted by lawyers); *see also Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985) (explaining liberal construction allows active interpretation of a *pro se* pleading to encompass any allegation which may raise a claim for federal relief).

4.   Petitioner's trial counsel provided constitutionally ineffective assistance, in violation of the Sixth and Fourteenth Amendments:

a.   when he failed to elicit testimony from a defense expert that the medical examiner who conducted the autopsy found that a stab wound to the back did not penetrate the victim's left lung;

b.   when he failed to elicit testimony from a defense expert that the medical examiner who conducted the autopsy found that a wound to the left chest cavity, apparently made by medical personnel when they inserted a chest tube into the victim, caused the bleeding to the left lung;

c.   when he failed to secure a jury instruction that would have applied the law of concurrent causation to the facts of the case; and

d.   due to the cumulative effect of his errors.

5.   The evidence is legally insufficient to prove that Petitioner intentionally or knowingly kidnapped or attempted to kidnap the victim and, therefore, his capital murder conviction was obtained without the due process of law, in violation of the Fifth and Fourteenth Amendments.[67]

---

[67] Pet. 4–8.

-13-

## II.   APPLICABLE LAW

"[C]ollateral review is different from direct review,"[68] and the writ of habeas corpus is "an extraordinary remedy"[69] reserved for those petitioners whom "society has grievously wronged."[70]   It "is designed to guard against extreme malfunctions in the state criminal justice systems."[71]   It provides an important, but limited, examination of an inmate's conviction and sentence.[72]   Accordingly, the federal habeas courts' role in reviewing state prisoner petitions is exceedingly narrow. "Indeed, federal courts do not sit as courts of appeal and error for state court convictions."[73]   They must generally defer to state court decisions

---

[68] *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993).

[69] *Id.*

[70] *Id.* at 634.

[71] *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

[72] *See Harrington v. Richter*, 562 U.S. 86, 103 (2011) ("[S]tate courts are the principal forum for asserting constitutional challenges to state convictions.").

[73] *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

on the merits[74] and on procedural grounds.[75]   They may not grant relief to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present.[76]

A federal court can grant relief only if "the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law,'"[77] or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[78]   The focus of this well-developed standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."[79]

---

[74] *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

[75] *Coleman v. Thompson*, 501 U.S. 722, 729–30 (1991); *Muniz v. Johnson*, 132 F.3d 214, 220 (5th Cir. 1998).

[76] *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996).

[77] *Berghuis v. Thompkins*, 560 U.S. 370, 378 (2010) (quoting 28 U.S.C. § 2254(d)(1) (2012)).

[78] § 2254(d)(2).

[79] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Moreover, the federal court's focus is on the state court's ultimate legal conclusion, not whether the state court considered and discussed every angle of the evidence.[80]   Indeed, state courts are presumed to "know and follow the law."[81]   Factual findings, including credibility choices, are entitled to the statutory presumption, so long as they are not unreasonable "in light of the evidence presented in the State court proceeding."[82]   Further, factual determinations made by a state court enjoy a presumption of correctness which the petitioner can rebut only by clear and convincing evidence.[83]   The presumption of correctness applies not only to express findings of fact, but also to "unarticulated findings which are necessary to the state court's conclusions of mixed law

---

[80] *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc); *see also Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review only the state court's decision, not its reasoning or written opinion . . . .").

[81] *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

[82] § 2254(d)(2).

[83] § 2254(e)(1); *see Clark v. Quarterman*, 457 F.3d 441, 444 (5th Cir. 2006) (noting that a state court's determination under § 2254(d)(2) is a question of fact).

and fact."[84]

In sum, the federal writ serves as a "'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."[85]

## III.   ANALYSIS

### A.   Denial of Right to Confront Witness

Petitioner first asserts that the trial court denied him his Sixth Amendment right to confront the witnesses against him by allowing the arresting officer, Officer Huante, to testify that Hernandez told him that the Petitioner had stabbed her.[86]   He explains that the trial court ruled the statement was admissible as a dying declaration.[87]

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be

---

[84] *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

[85] *Harrington*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring)).

[86] Pet. 4.

[87] *Id.* at 5.

confronted with the witnesses against him.'"[88] "[T]he admission of dying declarations is an exception which arises from the necessity of the cause. This exception was well established before the adoption of the constitution, and was not intended to be abrogated."[89]

Because the Texas Eighth Court of Appeals issued "the last reasoned opinion" on the matter, the Court will review the intermediate appellate court's decision to determine whether the denial of this claim was contrary to or an unreasonable application of federal law.[90] Regarding Petitioner's claim that his confrontation right was violated, the appellate court found the following:

> A dying declaration is a statement made by a declarant while believing that the declarant's death was imminent, concerning the cause or circumstances of what the declarant believed to be impending death . . . . [Hernandez] told Officer Huante several times that she was dying. [Officer] Huante believed, based on [her] condition, that she was going into shock and her death was imminent if she did not receive medical care. The record supports the trial court's

---

[88] *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (quoting U.S. Const. amend. VI).

[89] *Kirby v. United States*, 174 U.S. 47, 61 (1899).

[90] *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

-18-

> conclusion that [Hernandez] believed her death was imminent at the time she made the statements . . . . Assuming for the sake of argument that [Hernandez's] statements were testimonial, we conclude that the admission of this dying declaration did not violate [Petitioner's] right to confrontation under the Sixth Amendment.[91]

The state court's conclusion that the statement was properly admitted is entitled to deference by the Court.[92]   Further, the state court's adjudication of the merits was neither contrary to nor involved an unreasonable application of clearly established federal law.[93]   "By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (2)."[94] As such, Petitioner is not entitled to relief on this claim.

---

[91] *Valdez*, 2012 WL 4928905, at *5 (internal quotation marks omitted) (citing Tex. R. Evid. 804(b)(2)).

[92] *Parker v. Procunier*, 763 F.2d 665, 666 (5th Cir. 1985).

[93] *See Berghuis v. Thompkins*, 560 U.S. 370, 378 (2010) (quoting § 2254(d)(1)).

[94] *Harrington*, 562 U.S. at 98.

## B.   Withholding Evidence

Petitioner claims that the State, through the El Paso County District Attorney's Office, denied him his due process rights, in violation of the Fifth and Fourteenth Amendments, when it failed to disclose that its expert witness, Dr. Contin, had been discharged from his position as Chief Medical Examiner in 2000 because of incompetence.[95]

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[96]   "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[97]   "The mere possibility that an item of undisclosed information might have aided the defense, or might have affected the outcome of the trial, does

---

[95] Pet. 5.

[96] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[97] *United States v. Bagley*, 473 U.S. 667, 682 (1985).

not establish 'materiality' in the constitutional sense."[98]

During trial, Dr. Contin testified that he did not perform the autopsy, but offered his expert medical opinion, based on his review of the medical records, that Hernandez bled to death as a result of multiple stab wounds.[99]   Dr. Contin also testified about the peer review report.[100] The evidence presented at trial against Petitioner, with or without the testimony of Dr. Contin, was overwhelming:   Crystal Nesbitt testified that she heard and saw Petitioner and Hernandez arguing on June 15, 2008, that she entered Petitioner's house and saw Petitioner standing beside Hernandez with a knife in one hand and Hernandez's hair in the other, and that she saw her sister bleeding;[101] Maria Nesbitt also testified that she went to Petitioner's house and heard her daughter screaming and running, pleading with Petitioner to stop;[102] Officer Huante testified that Hernandez had multiple stab wounds to her chest

---

[98] *United States v. Agurs*, 427 U.S. 97, 109–10 (1976) *holding modified by Bagley*, 473 U.S. 667.

[99] Trial Tr. vol. 4, 38.

[100] *Id.* at 39–41.
[101] Trial Tr. vol. 3, 46–74.

[102] *Id.* at 114–17.

-21-

and umbilical area and that Hernandez told him that Petitioner did not allow Hernandez to leave and stabbed her multiple times;[103]   Finally, Dr. Grossberg testified that Hernandez ultimately died from blood loss.[104] The fact that Dr. Contin may have been discharged from his position as Chief Medical Examiner because of his alleged incompetence eight years before Hernandez's death would not have affected the outcome of the trial.   The State did not deny Petitioner his due process rights.

Further, the Texas Court of Criminal Appeals considered and rejected this claim on habeas review.[105]   Petitioner has not met his burden of showing that the state court's decision was contrary to, or an unreasonable application of Supreme Court law with respect to this claim.   Thus, Petitioner is not entitled to relief on his claim that the state violated his due process rights by failing to disclose that Dr. Contin was discharged from his position as Chief Medical Examiner.

_____

[103] *Id.* at 200–13.

[104] Trial Tr., vol. 4, 152–54.

[105] State Writ R. (Clerk's R.), WR-81,692-01, p. 42, Action Taken, Nov. 17, 2014, ECF Nos. 7-4, 7-1.

## C.   Jury Charge

Petitioner maintains that the trial court denied him a fair and impartial trial, in violation of the Fifth and Fourteenth Amendments, when it failed to address concurrent causation in the jury charge.[106] Petitioner contends that Hernandez died as a result of the medical intervention, and not from the stab wounds he inflicted.

A jury instruction may violate due process if it fails to give effect to the requirement that the State must prove every element of an offense.[107]   "Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation."[108]   A reviewing court must address "'whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.'"[109]   Thus, "'a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the

---

[106] Pet. 6.

[107] *Sandstrom v. Montana*, 442 U.S. 510, 520–521 (1979).

[108] *Middleton v. McNeil*, 541 U.S. 433, 437 (2004).

[109] *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

overall charge.'"[110]

Because the Texas Eighth Court of Appeals issued "the last reasoned opinion" on the matter, the Court will review the intermediate appellate decision to determine whether the denial of this claim was contrary to or an unreasonable application of federal law.[111]   The state appellate court explained that Petitioner failed to establish at trial that his actions were clearly insufficient to cause Hernandez's death, and he was not, therefore, entitled to an instruction on concurrent causation:

> An accused is entitled to a charge on every defensive issue raised by the evidence, regardless of whether it is strong, feeble, unimpeached, or contradicted.   *Muniz v. State,* 851 S.W.2d 238, 254 (Tex. Crim. App. 1993).   Conversely, the defendant is not entitled to an instruction that is not raised by the evidence.   *Remsburg v. State,* 219 S.W. 3d 541, 545 (Tex. App.—Texarkana 2007, pet. ref'd).   To raise an issue of concurrent causation under Section 6.04(a), there must be evidence that: (1) the defendant's actions were clearly insufficient to produce the result; and (2) a concurrent cause was clearly sufficient to produce the result.   TEX. PENAL CODE ANN. § 6.04(a);

---

[110] *Boyde v. California,* 494 U.S. 370, 378 (1990) (quoting *Cupp,* 414 U.S. at 146–47).

[111] *Ylst,* 501 U.S. at 803.

-24-

*Remsburg,* 219 S.W.3d at 545; *Hutcheson v. State,* 899 S.W.2d 39, 42 (Tex. App.—Amarillo 1995, pet. ref'd).

There is no evidence that [Petitioner's] actions were clearly insufficient to cause the victim's death. To the contrary, both Dr. Contin and [Petitioner's] expert, Dr. Grossberg, testified that [Hernandez] bled to death as the result of multiple stab wounds. While Dr. Grossberg questioned whether placement of the left chest tube might have caused an injury to the left lung and resultant bleeding, she did not testify that the stab wounds were clearly insufficient to cause [Hernandez's] death. In the absence of such evidence, [Petitioner] was not entitled to any instruction on concurrent causation.[112]

Petitioner has not established that the state court's judgment was contrary to, or an unreasonable application of Supreme Court law with respect to his claim. He also has not shown "that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[113] Therefore, Petitioner is not entitled to relief on this claim.

---

[112] *Valdez,* 2012 WL 4928905, at *6.

[113] *See Harrington,* 562 U.S. at 103.

-25-

### D.   Ineffective Assistance of Counsel

Petitioner asserts that his trial counsel provided constitutionally ineffective assistance, in violation of the Sixth and Fourteenth Amendments, in three ways.   First, he claims that his counsel was ineffective when he failed to elicit testimony from a defense expert that (1) the medical examiner who conducted the autopsy found that a stab wound to Hernandez's back did not penetrate her left lung, and (2) the wound to the left chest cavity, apparently made by medical personnel when they inserted a chest tube, caused the bleeding in her left lung.[114] Second, he maintains that his counsel provided ineffective assistance when he failed to secure a jury instruction that would have applied the law of concurrent causation to the facts of the case.[115]   Finally, he argues that his counsel provided ineffective assistance due to the cumulative effect of his errors.[116]

In order to prove an ineffective-assistance-of-counsel claim, a

---

[114] Pet. 6–7.

[115] *Id.* at 8.

[116] *Id.*

petitioner must satisfy both prongs of the test announced in *Strickland v. Washington*[117] by showing not only constitutionally deficient performance by counsel, but also actual prejudice to his legal position.[118] The Court need not address both components if the petitioner makes an insufficient showing on one.[119]   To demonstrate deficiency, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."[120]   A court considering such a claim "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance."[121]   To demonstrate prejudice, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

---

[117]  466 U.S. 668, 689–94 (1984).

[118]  *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir. 1994) (summarizing the *Strickland* standard of review).

[119]  *Strickland*, 466 U.S. at 697.

[120]  *Id.* at 687.

[121]  *Id.* at 689.

been different."[122]   A mere allegation of prejudice is not sufficient to satisfy the prejudice prong of *Strickland*.[123]   The probability "of a different result must be substantial, not just conceivable."[124]   Thus, counsel's performance is entitled to "a heavy measure of deference" by a reviewing court.[125]

Moreover, the Court must review a state petitioner's ineffective-assistance-of-counsel claim "through the deferential lens of [28 U.S.C.] § 2254(d),"[126]  and consider not only whether the state court's determination was incorrect, but also "whether [it] was unreasonable—a substantially higher threshold."[127]   Thus, in light of the deference accorded by § 2254(d), "[t]he pivotal question is whether the state court's

---

[122] *Porter v. McCollum*, 558 U.S. 30, 38–39 (2009) (internal quotation marks and citation omitted).

[123] *Armstead v. Scott*, 37 F.3d 202, 206 (5th Cir. 1994).

[124] *Harrington*, 562 U.S. at 112.

[125] *Cullen v. Pinholster*, 563 U.S. 170, 197 (2011) (internal quotation marks and citation omitted).

[126] *Id.* at 190.

[127] *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

application of the *Strickland* standard was unreasonable."[128]

> The standards created by *Strickland* and
> § 2254(d) are both highly deferential, and when
> the two apply in tandem, review is doubly so.
> The *Strickland* standard is a general one, so the
> range of reasonable applications is substantial.
> Federal habeas courts must guard against the
> danger of equating unreasonableness under
> *Strickland* with unreasonableness under
> § 2254(d).  When § 2254(d) applies, the question
> is not whether counsel's actions were reasonable.
> The question is whether there is any reasonable
> argument that counsel satisfied *Strickland's*
> deferential standard.[129]

### 1.    Failure to Elicit Testimony from Defense Expert

Petitioner claims that his counsel provided ineffective assistance

when he failed to elicit testimony from a defense expert.[130]   The

testimony, according to Petitioner, would have revealed that the medical

examiner who conducted the autopsy found that a stab wound to

Hernandez's back did not penetrate her left lung, and that the wound to

her left chest cavity, apparently made by medical personnel when they

---

[128] *Harrington*, 562 U.S. at 101.

[129] *Id.* at 105 (internal quotation marks and citations omitted).

[130] Pet. 7–8.

-29-

inserted a chest tube, caused the bleeding in her left lung.[131]   He
suggests that it was the medical personnel who caused Hernandez's
death.

The trial record shows that defense counsel elicited testimony from
the defense expert, Dr. Grossberg, during direct examination that the
stab wound to Hernandez's back may not have caused the bleeding in her
chest, the chest tube may have been unnecessary, and Hernandez's
death was preventable:

> Q.   [BY MR. LETTUNICH] Dr. Grossberg,
> what did you conclude about the left chest – the
> stab wound to the back of the left chest after
> reviewing Dr. Shrode's [autopsy] report?
> A.   In my opinion, based on the preoperative
> chest x-ray which shows no evidence of bleeding,
> and based on Dr. Shrode's report, and based on
> the other reports, my opinion is that I cannot 100
> percent rule out that the stab wound to the back
> did not cause the bleeding, but I don't feel that it is
> very likely.
> Q.   If it wasn't necessary for placement of the
> chest tube then why did the hospital do it?   Do
> you have any idea?
> A.   No.
> Q.   She had lost 500 ccs by the time she

---

[131] *Id.* at 6–8.

arrived at the hospital?

A. That was from the abdominal injury stab wound.

Q. She began – after the first surgery she began to bleed out of the left chest cavity, right?

A. Yes. During the operation I believe she lost 700 milliliters of blood through the left chest tube that they put into her left chest cavity.

Q. And –

A. And that operation was about an hour and a half long.

Q. How long did she continue to bleed out?

A. After the operation I believe she bled out another 500 milliliters while she was in the intensive care unit and then I think bled out a total of two liters of blood before she coded.

Q. Was anyone alerted to the bleed out?

A. It says in the medical records that, I believe, a Dr. Payne was alerted after she was noted to have 700 milliliters of blood drain out of the chest tube.

Q. What happened when he was alerted?

A. No action was taken.

Q. What's your opinion on that?

A. My opinion is that if you have 700 milliliters of blood coming out that you should get in there and figure out where it is that blood is coming from and we need to stop it.

Q. And then she ended up losing another 500. How many liters are in the human body?

A. Five liters.

Q. And there's 1,000 milliliters in a liter, right?

A. Correct.

Q. So she lost almost . . .

A. 40 percent of her blood volume. She had

-31-

to be given blood products as well.

Q.  So they were filling her up with blood as she was losing the blood?

A.  They had given her blood when she first came into the emergency room, and I think possibly during the surgery.  I am not sure what time it was.  It was early in her admission.

Q.  After the left chest tube was placed they knew she was – it was known she was bleeding because they were giving her blood?

A.  You know, I don't recall when they gave her the blood, but it was – I don't recall.

Q.  Okay.

A.  It may have been in surgery that they knew about it in the abdomen.

Q.  Okay.  Had they caught that bleeding in the left chest tube, in your opinion, where would [Hernandez] be today?

A.  I do believe that this was a preventable death because they were later able to go in there and take care of the source of bleeding and stop it.

Q.  Would she be alive?

A.  In my opinion, yes.

Q.  Are you familiar with the peer review studies that hospitals conduct?

A.  Yes.

Q.  Would you explain to the jury what those are?

A.  Whenever there is an adverse outcome, like a death, then they have a committee to review why the death occurred and what could possibly have been done differently, so they can learn from it and take better care of a patient.

Q.  Are you aware that there was a peer review study done or peer review of this particular case?

A.  Yes, there was.

-32-

> Q.   And have you had an opportunity to review that peer review?
> A.   Yes.
> Q.   And what did that peer review conclude?
> A.   That peer review also concluded that this was a preventable death.[132]

On cross examination, Dr. Grossberg conceded the medical records did not support her assertion that the stab wound to Hernandez's back likely did not cause the bleeding in her left lung; she agreed the medical records documented that a thoracotomy performed on Hernandez during her second surgery revealed her pulmonary vessels and chest wall were bleeding from the stab wound:

> Q.   Okay.  Do you agree that ultimately the victim died because of blood loss?
> A.   Yes.
> Q.   And that's ultimately what caused her brain death?
> A.   Correct.
> Q.   From the complications of losing too much blood?
> A.   Yes, that is correct.
> Q.   You do agree that she's at the hospital being treated for nine stab wounds?
> A.   Yes.
> . . . .
> Q.   [BY MS. BUTTERWORTH] During the

---

[132] Trial Tr., vol. 4, 132–35.

second surgery – again, these are coming from the medal [sic] records.   There is a thoracotomy performed on the left chest and they talk about the fact that they find pulmonary vessels bleeding and the chest wall stab wound bleeding.   Do you agree with that?

. . . .

Q.   That that's what that says in the medical records?

A.   Yes.

Q.   That when they go in there they see that the stab wound is bleeding, chest wall stab wound bleeding?

A.   Yes.[133]

In sum, Petitioner's counsel elicited testimony from Dr. Grossberg that supported the defense theory that the medical intervention contributed to Hernandez's death.   On cross examination, however, Dr. Grossberg conceded that the medical records documented that the stab wound to Hernandez's back did, in fact, penetrate her left lung. Moreover, Dr. Grossberg never testified that the multiple stab wounds were clearly insufficient to cause Hernandez's death.   Under these circumstances, Petitioner has not shown his "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the

---

[133] *Id.* at 152–54.

defendant by the Sixth Amendment."[134]   Thus, Petitioner has not shown that his counsel's performance was deficient.

### 2.   Failure to Request Jury Instruction

Petitioner also maintains that his counsel provided ineffective assistance when he failed to secure a jury instruction that would have applied the law of concurrent causation to the facts of the case.[135]

An attorney's decision to refrain from requesting a specific jury instruction is a "conscious and informed decision on trial tactics and strategy," which, like all such decisions, cannot form the basis for habeas corpus relief unless "it is so ill chosen that it permeates the entire trial with obvious unfairness."[136]   Such "[t]actical and strategical decisions of counsel 'if based on informed and reasoned practical judgment' will not be second-guessed."[137]   Moreover, courts will not find ineffective

---

[134] *Strickland*, 466 U.S. at 687.

[135] Pet. 8.

[136] *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983).

[137] *Ransom v. Johnson*, 126 F.3d 716, 721 (5th Cir. 1997) (citing *McCoy v. Lynaugh*, 874 F.2d 954, 964 (5th Cir. 1989) (quoting *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985)).

-35-

assistance of counsel merely because of a disagreement with counsel's trial strategy.[138]

As the Texas Eighth Court of Appeals explained in its opinion affirming Petitioner's convictions, "[t]o raise an issue of concurrent causation under Section 6.04(a), there must be evidence that: (1) the defendant's actions were clearly insufficient to produce the result; and (2) a concurrent cause was clearly sufficient to produce the result."[139] There was no evidence that Petitioner's actions were clearly insufficient to cause Hernandez's death.   A request for an instruction on concurrent causation would have been unavailing.   Because "[a]n attorney's failure to raise a meritless argument . . . cannot from the basis of a successful ineffective assistance of counsel claim," Petitioner has not established deficient performance.[140]

### 3.   Cumulative Error

Finally, Petitioner argues that his counsel provided ineffective

---

[138] *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999).

[139] *Valdez*, 2012 WL 4928905, at *6 (citing Tex. Penal Code Ann. § 6.04(a)).

[140] *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999).

assistance due to the cumulative effect of his errors.[141]

"[F]ederal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'"[142]   Because all of Petitioner's ineffective-assistance-of-counsel claims lack merit, he also fails to show that he was denied the effective assistance of counsel as a result of cumulative error.[143]

### 4.    Conclusion

Under the circumstances in this case, Petitioner has not shown that "counsel made errors so serious that counsel was not functioning as

---

[141] Pet. 8.

[142] *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

[143] *See United States v. Moye*, 951 F.2d 59, 63 n.7 (5th Cir. 1992) ("Because we find no merit to any of [Appellant's] arguments of error, his claim of *cumulative* error must also fail.").

the 'counsel' guaranteed the defendant by the Sixth Amendment."[144]

Moreover, he has not overcome the "'strong presumption' that counsel's

representation was within the 'wide range' of reasonable professional

assistance."[145]   Thus, he has not shown that his counsel provided

constitutionally ineffective assistance.

Furthermore, the Texas Court of Criminal Appeals has already

considered and rejected these ineffective-assistance-of-counsel claims on

state habeas review.[146]   Petitioner has not established that the state

court's conclusions were contrary to, or an unreasonable application of,

Supreme Court law with respect to his claims.   Petitioner is, therefore,

not entitled to relief on his ineffective-assistance-of-counsel claims.

### E.   Sufficiency of the Evidence

Finally, Petitioner maintains that the evidence is legally

insufficient to prove that he intentionally or knowingly kidnaped or

attempted to kidnap Hernandez and, therefore, his capital murder

---

[144] *Strickland*, 466 U.S. at 687.

[145] *Id.* at 689.

[146] State Writ R. (Clerk's R.) WR-81,692-01, 44–47, Action Taken (Aug. 27, 2014), Nov. 17, 2014, ECF Nos. 7-4, 7-1.

conviction was obtained without the due process of law, in violation of the Fifth and Fourteenth Amendments.[147]

In resolving a sufficiency-of-the-evidence claim, a court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[148]   A court must conduct this inquiry with "explicit reference to the substantive elements of the criminal offense as defined by state law."[149] Additionally, a court "must accept credibility choices that support the jury's verdict, and . . . may *not* reweigh the evidence."[150]

On direct appeal, the Eighth Court of Appeals discussed the evidence and concluded that it was sufficient to prove Petitioner guilty of capital murder while in the course of committing and attempting to commit the offense of kidnapping:

---

[147] Pet. 8.

[148] *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Dupuy v. Cain*, 201 F.3d 582, 589 (5th Cir. 2000).

[149] *Jackso*n, 443 U.S. at 324 n.16.

[150] *United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999).

Count I of the indictment charged [Petitioner] with capital murder. It alleged that he intentionally caused the death of Sarahi Hernandez by stabbing her with a knife while "in the course of committing and attempting to commit the offense of kidnapping." A person commits capital murder if he intentionally or knowingly causes the death of an individual while in the course of committing or attempting to commit kidnapping. TEX. PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(2) (West 2011). . . . A person commits the offense of kidnapping when he "intentionally or knowingly abducts another person." TEX. PENAL CODE ANN. § 20.03(a). "Abduct" is defined as restraining "a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* at § 20.01(2). "Restrain" is defined as restricting "a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* at § 20.01(1) . . . .

The fact that [Hernandez] initially accompanied [Petitioner] voluntarily to his house does not preclude the possibility that kidnapping subsequently occurred. *See Rodriguez v. State*, 730 S.W. 2d 75, 79 (Tex. App.—Corpus Christi 1987, no pet.). Likewise, [Petitioner's] friends did not observe [Hernandez] being held against her will at 3 a.m. when they left [Petitioner's] house, but that does not foreclose the possibility that the restraint on her liberty occurred after Gausin and Martinez left . . . . [Hernandez] told Office [sic] Huante that she wanted to leave but [Petitioner]

-40-

would not let her go.  Similarly, Petitioner told Crystal [Nesbitt] that he was going to let [Hernandez] leave until she and her mother arrived at the house.  This supports two inferences.  First, [Petitioner's] statement that he was going to let [Hernandez] leave indicates that it was his decision whether and when she could leave.  Second, the jury could have found that [Petitioner] refused to let [Hernandez] leave after her mother and sister arrived at his house.  We conclude that a rational trier of fact could find beyond a reasonable doubt [Petitioner] restricted [Hernandez's] movements and substantially interfered with her liberty by confining her to his home.[151]

Taking into account "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weight the evidence, and to draw reasonable inferences from basic facts to ultimate facts," any rational trier of fact could have found, based on the evidence presented at trial, the essential elements of capital murder in the course of committing and attempting to commit the offense of kidnapping beyond a reasonable doubt.[152]   The Eighth Court of Appeals' conclusion that the evidence was sufficient to support the conviction is entitled to deference by the

---

[151] *Valdez*, 2012 WL 4928905, at *7–8.

[152] *See Jackson*, 443 U.S. at 319.

Court.[153]   The Court finds the appellate court's analysis did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. Thus, Petitioner is not entitled to relief on this sufficiency-of-the-evidence claim either.

## IV.   EVIDENTIARY HEARING

A court will hold an evidentiary hearing on a § 2254 petition only when the petitioner shows either (1) the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or (2) a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.[154]   Petitioner does not assert that either prerequisite for a hearing exists in his case.   The record is adequate to dispose fully and fairly of Petitioner's claim.   The Court need inquire no further on collateral review and an evidentiary

---

[153] *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

[154] § 2254(d)(2)(A)–(B).

hearing is not necessary.

## V.   CERTIFICATE OF APPEALABILITY

A petitioner may not appeal a final order in a habeas corpus
proceeding "[u]nless a circuit justice or judge issues a certificate of
appealability."[155]   Further, appellate review of a habeas petition is
limited to the issues on which a certificate of appealability is granted.[156]
In other words, a certificate of appealability is granted or denied on an
issue-by-issue basis, thereby limiting appellate review solely to those
issues on which a certificate of appealability is granted.[157] Although

---

[155] § 2253(c)(1)(B) (2012).

[156] *See Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997) (holding that,
regarding the denial of relief in habeas corpus actions, the scope of
appellate review is limited to the issues on which a certificate of
appealability is granted).

[157] *See* 28 U.S.C. § 2253(c)(3) (setting forth the narrow scope of appellate
review in habeas corpus matters); *see also Lackey*, 116 F.3d at 151 (holding
that a certificate of appealability is granted on an issue-by-issue basis,
thereby limiting appellate review to those issues); *but see United States v.
Kimler*, 150 F.3d 429, 431 n.1 (5th Cir. 1998) ("We have decided, however,
that the monolithic nature of [Federal Rule of Appellate Procedure] Rule
22(b) in conjunction with Congress's mandate for issue specificity on
collateral review embodied in 28 U.S.C. § 2253(c)(3) requires a more
express request.   In order to obtain appellate review of the issues the
district court refused to certify, the petitioner must first make the threshold
substantial showing of the denial of a constitutional right.   *See* 28 U.S.C.

Petitioner has not yet filed a notice of appeal, this Court nonetheless must address whether he is entitled to a certificate of appealability.[158]

A certificate of appealability "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."[159] In cases where a district court rejects a petitioner's constitutional claims on the merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[160]   To warrant a grant of the certificate as to claims that the district court rejects solely on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the

---

2253(c)(2).   Only after clearing this hurdle may the petitioner proceed to brief and we review the merits of the rejected issues.").

[158] *See* 28 U.S.C. foll. § 2254 Rule 11(a) ("The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.").

[159] 28 U.S.C. § 2253(c)(2).

[160] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also United States v. Jones*, 287 F.3d 325, 329 (5th Cir. 2002) (applying *Slack* to a certificate of appealability determination in the context of § 2255 proceedings).

district court was correct in its procedural ruling."[161]   Here, Petitioner is not entitled to a certificate of appealability because reasonable jurists would not find debatable the Court's conclusions that he has not made a substantial showing of the denial of a constitutional right.   Therefore, the Court finds that it should deny Petitioner a certificate of appealability.

## VI.   CONCLUSION AND ORDERS

The Court concludes that Petitioner is not entitled to § 2254 relief. The Court further concludes that Petitioner is not entitled to a certificate of appealability.   Accordingly, the Court enters the following orders:

**IT IS ORDERED** that Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (ECF No. 3) is **DENIED**, and his cause is **DISMISSED WITH PREJUDICE.**

**IT IS FURTHER ORDERED** that Petitioner is **DENIED** a certificate of appealability.

**IT IS ALSO ORDERED** that all pending motions are **DENIED AS MOOT.**

---

[161] *Slack*, 529 U.S. at 484.

-45-

IT IS FINALLY ORDERED that the Clerk shall CLOSE this
case.

SIGNED this ____/9____ day of **July, 2016**.


_____
PHILIP R. MARTINEZ
UNITED STATES DISTRICT JUDGE